UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| TRAVIS K. ECHOLS, | ) | |
|---|---|---|
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | No.: 3:16-CV-00427 |
| | ) | REEVES/GUYTON |
| TAMMY FORD, Warden, | ) | |
| | ) | |
| Respondent. | ) | |

## MEMORANDUM OPINION

Petitioner Travis Echols, a Tennessee inmate proceeding *pro se*, has filed a federal habeas petition pursuant to 28 U.S.C. § 2254 challenging his Tennessee conviction for first-degree felony murder and resulting life sentence. Having considered the submissions of the parties, the State-court record, and the law applicable to Echols' claims, the Court finds that the petition should be denied.

### I. SUMMARY OF EVIDENCE & PROCEDURAL HISTORY

The Tennessee Supreme Court summarized the facts of this case as follows:

On June 18, 2005, the Knoxville Police Department responded to a report of a shooting incident at parking lot C of the Townview Towers apartment complex in Knoxville. The police found the victim, later identified as Robert Steely, a sixty-seven-year-old antique car dealer, slumped over in the driver's seat of a restored red and white 1958 Buick. The victim's wallet was missing, and he had bullet wounds in the chest. He later died at the University of Tennessee Hospital. The keys to the Buick were in the ignition, but the engine was off[,] and the windows were down. Police discovered a loaded .38 Titan Tiger (".38 Special") revolver underneath the victim's left arm. The weapon contained five live rounds and one spent round. Two .22 caliber cartridge cases were located on the pavement near the Buick. Police found a .22 caliber bullet behind the passenger door panel of the Buick and a .38 caliber bullet, later determined to have been fired from the victim's gun, lodged in a vehicle nearby.

Investigator Steve Still of the Knoxville Police Department interviewed several individuals at the crime scene who had heard gunshots, but none had witnessed the shooting. The police also found the victim's fingerprints on the outside of the

Buick, and those of Rebecca Ann Carpenter on the passenger side window frame and on a soft drink can. Testing of the three .22 caliber bullets, two of which were recovered from the victim's chest, produced inconclusive results. Although an expert was unable to determine whether they were fired from the same gun, the markings indicated that the bullets could have been fired from either a pistol, a semi-automatic revolver, or a rifle. Testing by the Tennessee Bureau of Investigation Crime Laboratory confirmed that the victim could have fired a weapon "or was near a gun when it fired."

Early in the investigation, Investigator Still received information from an unnamed source that Amanda Harshaw, a resident in unit D218 at the apartment complex, had permitted a black male named "Travis," who had a missing front tooth, to use her telephone shortly after the shooting took place. When questioned, Ms. Harshaw confirmed that she had overheard Travis say that he had shot someone in parking lot C who had a lot of money in his possession. Eight days after the shooting, Investigator Still received information from the same unnamed person that "Travis" had returned to Ms. Harshaw's apartment. Sergeant Tony Willis and several other officers were dispatched to the apartment. According to Sergeant Willis, a "female," presumably Ms. Harshaw, answered the door and gave him permission to search. Travis Kinte Echols ("the Defendant"), who matched the description Ms. Harshaw had given Investigator Still, was found in the bathroom of the apartment. Officers handcuffed the Defendant, who identified himself as Travis Brabson, and took him into custody. Before the Defendant was questioned, Sergeant Willis learned that there was an outstanding warrant for a "Travis Brabson" for failure to appear in court.

Investigator Still advised the Defendant of his *Miranda* rights and conducted a videotaped interview. After acknowledging that he knew the victim had fired his weapon, Investigator Still informed the Defendant that his statement could make a difference between a possible life sentence and some other less onerous form of punishment. Eventually, the Defendant admitted shooting the victim, but asserted that he had acted in self-defense. He explained that after the shooting he had thrown the gun in a quarry located in Halls. He showed Investigator Still where he claimed to have disposed of the weapon, but it was never found. Afterward, the Defendant was returned to the police station, the interview was concluded, he was charged, and placed in jail.

### Suppression Hearing

After being indicted for felony murder during the perpetration of a robbery, the Defendant moved to suppress the statement he had made to law enforcement officers, claiming that the statement was the product of an unlawful detention and arrest. The trial judge at that time, Kenneth F. Irvine, Jr., denied the motion. When Judge Irvine was succeeded in office by Judge Bobby R. McGee, the Defendant renewed the motion to suppress.

At the second suppression hearing, Investigator Still testified that during the week after the shooting, he discovered an individual who claimed to have learned that a man named "Travis" had admitted shooting somebody in lot C in a telephone call made from apartment D218 of Townview Towers. At that time, the police were not investigating any other shootings in lot C. Investigator Still interviewed Ms. Harshaw, the occupant of the apartment, and she confirmed that at some point after the shooting she had allowed a black male named "Travis," who was missing a front tooth, to use her telephone and that she had overheard him say he had shot someone in lot C. Ms. Harshaw assured Investigator Still that she would contact him if "Travis" showed up at her apartment again. On the night of June 26, 2005, the same individual who had referred Investigator Still to Ms. Harshaw called him while he was off duty to report that "Travis" was at apartment D218. Investigator Still then contacted Sergeant Tony Willis and asked him to go to Ms. Harshaw's apartment. A short while later, after the Defendant was taken into custody and transported to the jail, Investigator Still advised him of his rights and obtained a signed waiver before conducting an interview. When the Defendant indicated that he had a prior arrest in Anderson County, officials obtained his social security number and found several arrest records in the name of Travis Echols.

Sergeant Willis testified at the hearing that on June 26, 2005, he was on patrol duty when he received information from Investigator Still that the primary suspect in the lot C homicide was in apartment D218 at Townview Towers. Investigator Still described the suspect as an African–American male named "Travis" who was missing a front tooth. When Sergeant Willis and other officers arrived at the apartment, they were given permission by "a white female" to conduct a search. Sergeant Willis described her as "extremely nervous." Sergeant Willis found no one in the kitchen, living room, or the bedroom, but the bathroom door was closed. He directed the Defendant, who was inside, to come out. When the Defendant did so, he was ordered to the floor and handcuffed. The Defendant matched the description provided by Investigator Still and identified himself as Travis Brabson. While he was being taken to jail, which was only minutes away, Sergeant Willis learned that there was an outstanding arrest warrant for failure to appear on a misdemeanor drug citation in the name of Travis Brabson.

At the conclusion of the hearing, Judge McGee denied the motion to suppress, holding that the officer "had reasonable suspicion to justify a brief detention" and, for safety purposes, "to cuff him and take him into custody." While observing that the probable cause necessary to justify an arrest warrant was "pretty close," Judge McGee held that even if the police had insufficient information, the arrest was valid because the police soon learned of the warrant for the Defendant's arrest for his failure to appear in another case. Judge McGee also ruled that the Defendant's statement was not the product of coercion or intimidation.

## **Trial**

At trial, the victim's daughter, Darlene Thomas, portrayed her father as an army veteran and a hard-working, family man who cared for his disabled wife for some twenty-one years prior to her death. She testified that the victim bought and restored antique cars as a hobby. She further testified that he always carried a wallet and that "[h]e might have seven or eight thousand dollars on him at one time." She stated that he typically had a handgun either in his pocket or under the front seat of his car, even though he did not have a permit. Ms. Thomas also stated that the victim had a girlfriend whom she had never met.

George Hammontree testified that on the date of the murder he had attended a birthday party at Townview Towers. He recalled that when he returned to his car for cigarettes, he dropped them to the floorboard and was reaching down to retrieve them when someone yelled, "Give it up[, g]ive it up." He then saw two black males and one white female next to a red and white car. He testified that one of the males, who had "dreadlocks," pointed a rifle at an older man who was seated in the vehicle with his hands in the air. When Hammontree saw the rifle, he moved to the floor of his van and then heard "pat, pat, pat, boom"—the sounds of "three small [shots] and then one big one." Hammontree, who claimed to be familiar with weapons, testified that the first three shots were fired from a .22 caliber automatic rifle whereas the final shot had come from a larger caliber gun. When he heard no more gunshots, Hammontree looked up and saw the female running with so much effort that she lost her tennis shoes. He recalled that the two males ran down a bank. Hammontree claimed that he was so scared by the shooting, he returned to the party and chose not to make a statement to police officers who later arrived at the scene.

One or two weeks later, Hammontree contacted Investigator Still and identified the Defendant from a photographic lineup as the individual who had shot the victim. At trial, Hammontree again identified the Defendant as the assailant, claiming "a hundred percent" certainty. On cross-examination, however, Hammontree acknowledged that during the Defendant's preliminary hearing, he had identified another individual as the person who fired the shots. He explained, however, that "[t]hey both look alike[,] ... both had their hair poofed out" and that he had "just [made] a mistake" at the hearing as a result of his nervousness. Hammontree also admitted that he had a criminal record, including convictions for aggravated burglary, theft, and criminal impersonation. While acknowledging that forgery and theft charges were pending against him, he claimed that he was not promised anything by the State in return for his testimony against the Defendant.

Rebecca Ann Carpenter, who sometimes worked as a prostitute and admitted to having a drug problem, testified that she had gone to Townview Towers to purchase drugs on the morning of the shooting. She stated that later that day, in a different part of town, she approached the victim because he had motioned for her to come to his car. She claimed that even though the victim had mistaken her for someone else, she spoke to the victim and then asked for a ride in his restored car. The victim

agreed to drive her home and, according to Ms. Carpenter, offered to take her to his residence for drinks. She denied that they ever discussed sex. When she asked for "pot," the victim drove her to Townview Towers and removed eighteen dollars from his wallet, which, she said, contained "[l]ots of money." Upon arriving at the apartment complex, Ms. Carpenter walked down the steps into a corridor and recognized the Defendant as the person who had sold her crack cocaine earlier that morning. When Ms. Carpenter returned to the victim's car to ask for more money, she saw the Defendant point a silver and black, long-barrel weapon at the victim. Ms. Carpenter described the Defendant as a black male, with "long hair," "[k]ind of a fro like," and "[k]ind of frizzy looking," and possibly having a mustache. She claimed that she did not hear the Defendant say "give it up" and did not remember seeing the victim put his hands up in the air. She testified that when she heard the first gunshot she "hit the ground," and, when the firing ceased after four or five more shots, she reached in through the victim's open car window, grabbed her purse from the passenger seat, and ran away. She claimed that the victim's wallet was still in his back pocket when she fled. She did not recall any other person besides the Defendant being near the scene of the shooting.

Ms. Carpenter further testified that as she fled down some steps after the shooting, she ran into the Defendant, who instructed her to go back and look for the shells from his gun. Ms. Carpenter stated that she ran out of her flip-flops as she returned to the scene and pretended to look for the shells, but became fearful and ran back down the steps. She claimed that the Defendant then told her to return to the vehicle and wipe away her fingerprints. Ms. Carpenter testified that she only pretended to follow the Defendant's instructions and did not wipe away her prints. Ms. Carpenter explained that she hid in the apartment complex for a period of time after the Defendant had left. Several weeks later, she told Investigator Still what had happened and identified the Defendant from a photographic lineup. When asked to make an identification of the Defendant during the trial, however, Ms. Carpenter testified that she was unable to because she could not "see good without [her] glasses." On cross-examination, Ms. Carpenter admitted to having a conviction for tampering with government records.

James Blackwell, who had been incarcerated with the Defendant at the Knox County penal farm, was serving a federal sentence for cocaine distribution at the time of the trial. Called as a witness by the State, he testified that the Defendant had informed him that he was facing twenty-five years to life for shooting and killing a man in self-defense. According to Blackwell, the Defendant confided that he was arranging for the man to buy drugs from his cousin, but when he saw how much money the man had, he armed himself with a .22 caliber rifle and then robbed him of almost ten thousand dollars. Blackwell recalled that the Defendant claimed that he shot the man only because the man had shot at him first. Blackwell stated that the Defendant referred to the money as "a knot," which he described as "[a] big wad of cash," and remembered that the Defendant had said he planned to use the money to pay for his attorney. He also recalled the Defendant saying that he tossed the gun into the river under the James White Parkway. On cross-examination,

5

> Blackwell admitted that he had entered into a plea agreement on his federal charge and that the plea agreement had set out the "nature, extent, and value of [his] cooperation" in this case. He conceded that the federal prosecutor had requested a downward departure from the federal sentencing guidelines as part of that plea agreement.
>
> The Defendant, who testified in his own defense, first attempted to explain his use of two surnames. He claimed that at the age of fifteen his name was legally changed from Echols to Brabson. He explained that he did not change the name on his driver's license because he did not have the court order at the time he renewed his license. He further maintained that he signed "Echols" after his arrest only because he was charged under the name Echols.
>
> The Defendant testified that on the date of the shooting, he was selling drugs at Townview Towers when he saw a red and white car driven by the victim, who was white, and occupied by a white female enter into the parking lot. He explained "[n]ot too many white people just pull into [Townview Towers] unless they was looking for crack cocaine." The Defendant stated that when the female stepped out of the car, he first asked her for a cigarette, which he described as a customary "ice breaker" before a drug transaction, but she kept going and did not respond. He claimed that when he then asked the victim if he could have a cigarette, the victim "freaked out," reached under his seat for a gun, and, as the Defendant ran for cover, fired a shot. The Defendant admitted that he then took a gun from his back pocket and, fearing the victim might shoot again, fired three or four shots in his direction. He contended that he never ordered the victim to put his hands in the air. The Defendant denied that he robbed the victim and testified that after the shooting, he took his rental car, drove to a quarry in Halls, and threw the pistol into the water. He also contended that he never spoke to Blackwell, whom he had identified as a federal inmate by his beige uniform, because federal prisoners at the penal farm were known to cooperate with the police. He further denied that he had ever worn dreadlocks.

*State v. Echols*, 382 S.W.3d 266, 271–75 (Tenn. 2012) (footnotes omitted).

Following a jury trial, Echols was convicted by a Knox County jury for first-degree felony murder and received an automatic sentence of life imprisonment [Doc. 11-1 p. 122-26]. His conviction and sentence were affirmed on appeal to the Tennessee Court of Criminal Appeals [Doc. 11-22]. Thereafter, the Tennessee Supreme Court granted Echols' application for permission to appeal, but ultimately affirmed his conviction in an opinion filed October 10, 2012 [Docs. 11-24 & 11-30].

6

Echols timely sought post-conviction relief, but following the appointment of counsel and an evidentiary hearing, the petition was denied [Doc. 11-17 p. 55-75]. Aggrieved, Echols appealed the post-conviction court's decision to the Tennessee Court of Criminal Appeals, which affirmed the judgment of the post-conviction court [Doc. 11-33]. *See also Echols v. State*, No. E2015-00601-CCA-R3-PC, 2016 WL 197789, at *1 (Tenn. Crim. App. Jan. 15, 2016). The Tennessee Supreme Court subsequently denied his application for permission to appeal in an order filed May 5, 2016 [Doc. 11-35].

On or about June 10, 2016, Echols filed the instant action, as later amended, raising the following grounds for relief, as paraphrased by the Court:

| | |
|---|---|
| Ground One: | Racial discrimination in State's use of peremptory strikes |
| Ground Two: | Insufficiency of the evidence |
| Ground Three: | Erroneous denial of suppression motions |
| Ground Four: | Improper exclusion of defense witness from trial |

[Docs. 1 & 5]. Respondent answered the amended petition on November 28, 2016 [Doc. 10]. Echols moved for and was permitted additional time within which to file a reply but ultimately failed to file a reply to Respondent's answer [*See* Docs. 12-14].

## II. LEGAL STANDARD

The Court's review of the instant petition is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which prevents the grant of federal habeas relief on any claim adjudicated on the merits in a State court unless that adjudication (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established United States Supreme Court precedent; or (2) resulted in a decision based on an unreasonable determination of facts in light of the evidence presented. *See* 28 U.S.C. § 2254(d)(1) & (2); *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007).

Federal habeas relief may be granted under the "contrary to" clause where the State court (1) arrives at a conclusion opposite that reached by the Supreme Court on a question of law; or (2) decides a case differently than the Supreme Court on a set of materially indistinguishable facts. *See Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). Under the "unreasonable application" clause, a federal court may grant relief where the State court applies the correct legal principle to the facts in an unreasonable manner. *See id*. at 407-08; *Brown v. Payton*, 544 U.S. 133, 141 (2005). Whether a decision is "unreasonable" is an objective inquiry; it does not turn on whether the decision is merely incorrect. *See Schriro*, 550 U.S. at 473 ("The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable − a substantially higher threshold."); *Williams*, 529 U.S. at 410-11. This standard will allow relief on a federal claim decided on its merits in State court only where the petitioner demonstrates that the State ruling "was so lacking in justification that there was an error understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011). When evaluating the evidence presented in state court, a federal habeas court presumes the correctness of the State court's factual findings unless the petitioner rebuts the presumption by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1).

The doctrine of procedural default also limits federal habeas review. *See O'Sullivan v. Boerckel*, 526 U.S. 838, 848 (1999) (holding prisoner's procedural default forfeits his federal habeas claim). A procedural default exists in two circumstances: (1) where the petitioner fails to exhaust all of his available state remedies, and the State court to which he would be required to litigate the matter would now find the claims procedurally barred, and (2) where a State court clearly and expressly bases its dismissal of a claim on a state procedural rule, and that rule provides an independent and adequate basis for the dismissal. *See, e.g., Coleman v. Thompson*, 501 U.S.

722, 731-32, 735 n.1 (1991). A procedural default may be circumvented, allowing federal habeas review of the claim, only where the prisoner can show cause and actual prejudice for the default, or that a failure to address the merits of the claim would result in a fundamental miscarriage of justice. *Id.* at 750; *see also Wainwright v. Sykes*, 433 U.S. 72, 87, 90-91 (1977). "Cause" is established where a petitioner can show some objective external factor impeded defense counsel's ability to comply with the state's procedural rules, or that his trial counsel rendered ineffective assistance. *See id.* at 753. Additionally, the prejudice demonstrated to overcome the default must be actual, not merely a possibility of prejudice. *See Maupin v. Smith*, 785 F.2d 135, 139 (6th Cir. 1986) (citations omitted).

## III. DISCUSSION

### A. The State's use of peremptory strikes

In his first ground for relief, Echols argues that the State violated the Equal Protection Clause in its use of a peremptory challenge to remove an African-American female from the jury pool [*See* Doc. 5 p. 5]. Echols presented this claim on direct appeal, where the Tennessee Supreme Court rejected Echols' claim, noting that the totality of the circumstances did not support a finding of purposeful discrimination. *See Echols*, 382 S.W.3d at 281-82.

The use of a peremptory challenge to exclude jurors on the basis of race violates a defendant's right to equal protection. *Batson v. Kentucky*, 476 U.S. 79, 89 (1986); *Powers v. Ohio*, 499 U.S. 400, 409 (1991). In *Batson*, the Court established a three-part analysis for a defendant claiming racial discrimination in the prosecutor's use of peremptory challenges: (1) "the claimant must first establish a *prima facie* case of racial discrimination;" (2) after which "the party exercising the peremptory must offer a race-neutral explanation" for striking the juror in question; and (3) finally, after a race-neutral explanation is offered, "the challenging party must demonstrate

that the purported explanation is merely a pretext for a racial motivation." *McCurdy v. Montgomery Cty., Ohio*, 240 F.3d 512, 521 (6th Cir. 2001).

At Echols' trial, the jury venire contained only two African-Americans [*See* Doc. 11-9 p. 101]. The State used a peremptory challenge to excuse an African-American woman as a prospective juror, to which Defendant objected [*Id*.]. The State explained that the woman failed to make eye contact with the attorney for either party, had "asked the court officer something," and the State sensed she did not want to be there [*Id.* at 101-02]. Defendant pointed out that a White male had asked to be relieved from jury service and was denied, while the prospective juror at issue made no such request [*Id*. at 107]. The trial court made no express determination as to whether Defendant had made a *prima facie* case of discrimination but upheld the State's challenge as race-neutral, noting "I've noticed also some of the things [the State]'s been talking about. [The prospective juror] has gotten the officer's attention a couple of times" [*Id.* at 102].

After the venire was excused, the Court noted that it had spoken to the court officer, who stated that the prospective juror informed the officer that she had an appointment and asked if she could leave at a particular time to make a telephone call [*Id*. at 107-08]. The State noted that the prospective juror was fidgety and seemed angry "about still being seated there" [*Id*. at 109]. The trial court stated that its "inquiry tends to confirm that the young lady was anxious, that she had somewhere else she wanted to be, and that she, in fact, asked for permission to leave the courtroom [*Id*. at 110].

The Court finds that the State's proffered reasons, i.e. the prospective juror's demeanor and body language, were non-discriminatory, and the trial court observed the same and made an independent assessment of those explanations. Under this record, the rejection of this claim fails to warrant federal habeas relief. *See Hernandez v. New York*, 500 U.S. 352, 365 (1991) (noting whether counsel's race-neutral explanation should be believed lies "peculiarly within a trial

judge's province" (citation omitted); *McCurdy*, 240 F.3d at 521 (noting body language and demeanor are race-neutral reasons that must be independently assessed by trial court).

### B. The sufficiency of the evidence

Echols next claims that the evidence presented at his trial is insufficient to support his conviction for first-degree felony murder, as the State failed to prove the underlying felony, or that he was not acting in self-defense [Doc. 5 p. 6-7]. On direct appeal, the Tennessee Supreme Court rejected Echols' claim that the evidence was insufficient to establish that he killed the victim during the commission of a robbery, finding that "[v]iewed in the light most favorable to the State, the proof [at trial] established that the Defendant shot and killed the victim during the course of a robbery, which satisfies the elements necessary to support a conviction for felony murder." *Echols*, 382 S.W.3d at 282-84.

A federal habeas petitioner can successfully challenge the sufficiency of the evidence only when the evidence, viewed in the light most favorable to the prosecution, is such that no reasonable fact finder "could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). At Echols trial, George Hammontree testified that he saw Echols point a rifle at the victim, who held up his hands [Doc. 11-7 p. 59-61]. He stated that he heard four shots – three from a .22 caliber weapon, and one shot from a higher-caliber weapon [*Id*. at 65-67]. Hammontree subsequently identified Echols as the perpetrator from a photographic lineup [*Id*. at 75-76, 81]. Additionally, Rebecca Ann Carpenter testified that she heard a gunshot and saw Echols holding a gun [Doc. 11-8 p. 37-38]. She stated that the victim had his wallet in his back pocket when she ran away, while no wallet was found by the police during the investigation of the crime scene [*See id*. p. 56]. She also identified Echols as the shooter from a photographic lineup [*Id*. at 57].

11

James Blackwell testified that Echols had admitted to him that he shot the victim in self-defense and took almost $10,000 from the victim's pocket [*Id*. at 84-89]. Echols admitted shooting the victim three to four times with a .22 caliber weapon but claimed he did not rob the victim and only shot in self-defense after the victim fired first [Doc. 11-9 p. 105-07; Doc. 11-10 p. 105-106].

Echols' claim of self-defense and denial of robbery was presented to, and rejected by, the jury. The Court finds that on the proof presented, a reasonable juror could find beyond a reasonable doubt that Echols committed a killing in the perpetration of a felony, rather than in self-defense. Accordingly, the State court's application of *Jackson* was not unreasonable, and Echols is not entitled to federal habeas relief on this claim.

### C. Suppression of statement to law enforcement

Echols next claims that his statement to law enforcement should have been suppressed, as its admission at his trial violated his Fourth and Fifth Amendment rights [Doc. 5 p. 8].

#### 1. Probable cause

An arrest supported by probable cause is an exception to the warrant requirement of the Fourth Amendment. *United States v. Watson*, 423 U.S. 411, 418 (1976); U.S. Const. amend. IV ("The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated...."). Probable cause exists if, at the time of the arrest, the facts and circumstances within the knowledge of the officers, and of which they had reasonably trustworthy information, are sufficient to warrant a prudent person in believing that the defendant had committed or was committing an offense. *Beck v. Ohio*, 379 U.S. 89, 91 (1964). It is a standard that "deals with probabilities. . . not technical[ities]. . . the factual and practical considerations of everyday life on which reasonable and prudent" persons act. *Brinegar v. United States*, 338 U.S. 160, 175 (1949).

The Tennessee Supreme Court found that Echols was subjected to a "full-blown arrest" when was placed in handcuffs at Harshaw's apartment. *Echols*, 382 S.W.3d at 279. Accordingly, the issue is whether probable cause supported the arrest.

In this case, Investigator Still received information from an unidentified source that led him to interview Harshaw, who described Echols (an African-American male with a missing front tooth) and described a phone conversation she overheard in which Echols admitted shooting the victim [Doc. 11-3 p. 12-14, 38-41]. The source again called law enforcement to advise that the suspect was again in Harshaw's apartment, and Investigator Still contacted Sergeant Willis and asked him to go to the location and detain the suspect [*Id*. at 41-42]. Upon arrival at the apartment, Sergeant Willis asked for and received permission to conduct a search, whereupon he discovered an African-American male with a missing tooth in the bathroom of the apartment [Doc. 11-8 p. 73-76]. The Court determines that the finding that the above was reasonably trustworthy information from which a prudent person could infer that Echols had committed an offense is not unreasonable, and Echols is not entitled to federal habeas relief as to this claim. *See Brinegar*, 338 U.S. at 175-76.

### 2. Waiver of *Miranda* rights

In *Miranda v. Arizona*, the Supreme Court held that, prior to a custodial interrogation, an accused must be advised of certain rights, such as the right to silence and the right to counsel, to protect his privilege against self-incrimination. *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). These rights may be waived, provided that, under the totality of the circumstances, the waiver is made "voluntarily, knowingly[,] and intelligently." *Miranda*, 384 U.S. at 445; *Clark v. Mitchell*, 425 F.3d 270, 283 (6th Cir. 2005). In deciding the validity of a waiver, courts examine "the particular facts and circumstances surrounding [the] case, including the background, experience, and conduct of the accused." *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938).

In this case, Echols was read all of the rights outlined in *Miranda*, he was advised he could stop the interview at any time, and he signed the waiver form [*See, e.g.,* Doc. 11-15 p. 76]. He was twenty-six at the time of the interview, a high-school graduate, and he had previous encounters with law enforcement [Doc. 11-10 p. 99; Doc. 11-11 p. 17; Doc. 11-3 p. 25-59]. There is no indication in the record that he had endured a lengthy detention prior to the interview, that he was intoxicated or ill at the time of the interview, or that he was subjected to abuse or threats. Accordingly, the Court finds that the decision rejecting this claim does not warrant federal habeas relief.

### D. Exclusion of witness

In his final claim for relief, Echols asserts that his defense investigator was improperly excluded from trial [Doc. 5 p. 10]. Respondent argues that Echols only raised this claim on State-law grounds in State court, under Tennessee Rule of Evidence 615 [Doc. 19 p. 54-55]. The Court notes that the claim was rejected on State-law grounds on direct appeal by the Tennessee Court of Criminal Appeals [Doc. 22 p. 33-36]. On post-conviction, the Court of Criminal Appeals deemed it waived and/or previously-determined [Doc. 33 p. 10-11].

As an initial matter, the Court finds that, to the extent Echols raises this claim on the basis of State law, it is not cognizable in a federal habeas proceeding. 28 U.S.C. § 2254; *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (reemphasizing "that it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions"). To the extent that Echols attempts to now challenge the exclusion of a defense witness on constitutional grounds, such a claim is procedurally defaulted for his failure to present it to the State courts in his post-conviction petition. *See O'Sullivan*, 526 U.S. at 847-48 (holding where petitioner fails to present claim to state courts and no state remedy remains available, the claim is procedurally defaulted); *see also* Tenn. Code Ann. § 40-30-102(c) ("one petition" rule).

Echols has not argued that he can satisfy the "cause and prejudice" or fundamental miscarriage of justice standards as required to review the claim, and the Court finds this claim not cognizable in these proceedings and/or otherwise procedurally defaulted and barred from review.

## IV.  CERTIFICATE OF APPEALABILITY

A petitioner must obtain a certificate of appealability ("COA") before he may appeal this Court's decision denying federal habeas relief. 28 U.S.C. § 2253(c)(1). A COA will not issue unless a petitioner makes "a substantial showing of the denial of a constitutional right" of any claim rejected on its merits, which a petitioner may do by demonstrating that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." 28 U.S.C. § 2253(c)(2); *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). To obtain a COA on a claim that has been rejected on procedural grounds, a petitioner must demonstrate "that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Slack*, 529 U.S. at 484. Applying this standard, the Court concludes that a COA should be denied in this case.

## V.  CONCLUSION

Travis Echols has failed to demonstrate an entitlement to federal habeas relief. Therefore, his petition for a writ of habeas corpus will be **DENIED**, and this action will be **DISMISSED WITH PREJUDICE**. A certificate of appealability from this decision will be **DENIED**.

Further, the Court will **CERTIFY** that any appeal from this action would not be taken in good faith and would be totally frivolous. Fed. R. App. P. 24.

**AN APPROPRIATE ORDER WILL ENTER.**

*/s/ Pamela L. Reeves*
**CHIEF UNITED STATES DISTRICT JUDGE**